# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MICHELLE FREUDENBERG, as          )
Administratrix of the Estate of   )
ERIC FREUDENBERG, deceased,       )
                                  )        Case No.: 7:23-CV-847-KMK
                                  )
      Plaintiff,             )
                                  )
v.                                )
                                  )
COUNTY OF ORANGE, et al.,         )
                                  )
                                  )
      Defendants.            )

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Daniel E. Smolen, OBA#19943 (Pro Hac Vice)
Robert M. Blakemore, OBA #18656 (Pro Hac Vice)
Bryon D. Helm, OBA #33003 (Pro Hac Vice)
SMOLEN & ROYTMAN
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

-and-

P. JENNY MARASHI, ESQ.
930 Grand Concourse, Suite 1E
Bronx, NY 10451
917-703-1742
Marashi.legal@gmail.com

***Attorneys for Plaintiff***

# TABLE OF CONTENTS

*Page*

Table of Contents     i

Table of Authorities     ii

Introductory Statement     1

Standard of Review     4

Discussion     4

<u>Proposition:</u>    Plaintiff has alleged sufficient facts to state claims for relief that are "Plausible" on their face.     4

     A.   Plaintiff *Has* Plausibly Alleged That the "Individual Medical Defendants" Were Deliberately Indifferent to Mr. Freudenberg's Serious Medical Needs     4

     B.   Plaintiff *Has* Adequately Pled a Municipal Liability -- or "*Monell*" – Theory     10

     C.   Plaintiff Has No Intention of Pursuing a *Monell* Claim Against the Individual Medical Defendants. However, the Sheriff Can be Sued in His "Official Capacity"     16

     D.   Plaintiff Has No Intention of Pursuing any "Supervisory Liability" Claim     16

     E.   Plaintiff Has Adequately Pled ADA and Section 504 Claims Against the County and Wellpath     16

     F.   Defendants Failed to Raise Any Argument Concerning Dismissal of the Wrongful Death Claim in Their August 17, 2023 Pre-Motion Letter. As Such, the Argument, as Asserted in the Motion to Dismiss, Should be Disregarded     22

     G.   Plaintiff Concedes that *Respondeat Superior* Does Not Apply in the Section 1983 Context. Plaintiff Agrees that *Respondeat Superior* is Not a Separate Cause of Action     22

| *Case* | *Page(s)* |
|---|---|
| *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) | 4, 11 |
| *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) | 4 |
| *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) | 4 |
| *Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019). | 10 |
| *Bess v. City of New York*, No. 11 CIV. 7604 TPG, 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) | 11 |
| *Bolden v. Westchester Cnty. N.Y. Bd. of Ethics*, 2023 U.S. Dist. LEXIS 102266, *37 | 21 |
| *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131 (2d Cir. 1995) | 21 |
| *Burke v. Regalado*, 935 F.3d 960, 987-88, 999-01 (10th Cir. 2019) | 13 |
| *Burns v. Rensselaer Cnty.*, No. 919CV00701BKSCFH, 2021 WL 1091558, at *6–7 (N.D.N.Y. Mar. 22, 2021) | *passim* |
| *Carlisle v. City of Yonkers*, 104 F.3d 352 (2d Cir. 1996) | 14 |
| *Carmichael v. City of N.Y.*, 34 F. Supp. 3d 252 (E.D.N.Y. 2014) | 11 |
| *Carter v. Broome Cnty.*, 394 F. Supp. 3d 228 (N.D.N.Y. 2019) | 12, 13 |
| *Cash v. Cty. of Erie*, 654 F.3d 324 (2d Cir. 2011) | 11 |
| *Castro v. Cnty. of Nassau*, 739 F.Supp.2d 153, 184 & n. 27 (E.D.N.Y.2010) | 22 |
| *Ceparano v. Suffolk Cnty. Dep't of Health*, 485 F. App'x 505 (2d Cir. 2012) | 12 |
| *Charles v. Orange Cnty.*, 925 F.3d 73 (2d Cir. 2019) | 5, 6, 9 |
| *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) | 14 |
| *Crews v. Cnty. of Nassau*, 996 F. Supp. 2d 186 (E.D.N.Y. 2014) | 22 |
| *Cruz v. Corizon Health Inc.*, No. 13-CV-2563, 2016 WL 4535040, at *8 n.11 (S.D.N.Y. Aug. 29, 2016). | 11 |

*Darnell v. Pineiro*, 849 F.3d 17, 33 n. 9 (2d Cir. 2017)     5, 8, 10

*Dixon v. Cty. of Cook*, 819 F.3d 343 (7th Cir. 2016)     12

*Doe v. Pfrommer*, 148 F.3d 73 (2d Cir. 1998)     17

*Earl v. Espejo*, 2017 U.S. Dist. LEXIS 137398, *10-1     19

*EEOC v. Port Auth.*, 768 F.3d 247 (2d Cir. 2014)     4

*Elbert v. New York State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590     19

*Gleeson v. Cnty. of Nassau*, No. 15CV6487AMDRL, 2019 WL 4754326, at *13 (E.D.N.Y. Sept. 30, 2019)     16

*Grubbs v. Ngbodi*, No. 21-CV-02906 (NSR), 2022 WL 4072926, at *8 (S.D.N.Y. Sept. 2, 2022)     7, 8

*Hardy v. Diaz Us. Dist. LEXIS 39295 (N.D.N.Y. March 30, 2010,* and *Sims v. City of New York*, 2018 U.S. Dist. LEXIS 212966)     20

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003)     17

*Iacovangelo v. Corr. Med. Care, Inc.*, No. 13-CV-6466 CJS, 2014 WL 4955366, at *1 (W.D.N.Y. Oct. 2, 2014), *aff'd in part, vacated in part, remanded,* 624 F. App'x 10 (2d Cir. 2015)     15

*Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007)     6

*Johnson v. Wright*, 234 F. Supp. 2d 352 (S.D.N.Y. 2002)     8

*J.R. v. N.Y. City Dep't of Educ.*, 2015 U.S. Dist. LEXIS 110366, *12     17

*Kennedy v. Dresser Rand Co.*, 193 F.3d 120 (2d Cir.1999)     21

*Kentucky v. Graham*, 473 U.S. 159 (1985)     16

*Kern v. City of Rochester*, 93 F.3d 38 (2d Cir. 1996)     11

*Khatri v. Garland*, 2023 U.S. App. LEXIS 497, *3     18

*Kucharczyk v. Westchester Cnty.*, 95 F. Supp. 3d 529 (S.D.N.Y. 2015)     14

*Lacayo v. Donahoe*, 2015 U.S. Dist. LEXIS 26621, *54     20

*Marino v. City Univ. of N.Y.*, 18 F. Supp. 3d 320, 342     17

*Mayor & City Council of Balt. v. Citigroup,* Inc., 709 F.3d 129 (2d Cir. 2013) ........... 4

*McNeil v. Corr. Med. Care, Inc.,* No. 918CV0894LEKDJS, 2019 WL 4415528, at *9 (N.D.N.Y. Sept. 16, 2019) ........... 12

*Meekins v. City of New York*, 524 F. Supp. 2d 402 (S.D.N.Y. 2007) ........... *21*

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) ........... *passim*

*Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210, 118 S. Ct. 1952, 141 L. Ed. 2d 215 (1998) ........... 20

*Paschal-Barros v. Quiros*, 2022 U.S. Dist. LEXIS 6641, *22 ........... 21

*Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002) ........... 18

*Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119 (2d Cir. 1991) ........... 12

*Roe v. City of Waterbury,* 542 F.3d 31 (2d Cir. 2008) ........... 11

*Roth v. Jennings,* 489 F.3d 499 (2d Cir. 2007) ........... 17

*Sanchez v. New York Correct Care Sols. Med. Servs., P.C.,* No. 16-CV-6826 CJS, 2018 WL 6510759, at *9 (W.D.N.Y. Dec. 11, 2018) ........... 12, 14

*Scalercio-Isenberg v. Port Auth. of N.Y. & N.J.,* 487 F. Supp. 3d 190, 201 (S.D.N.Y. 2020) ........... 21

*Segal v. City of New York,* 459 F.3d 207 (2d Cir. 2006) ........... 10

*Shomo v. City of New York,* 579 F.3d 176 n.3 (2d Cir. 2009) ........... 11

*Smith v. NaphCare Inc.,* 2023 U.S. Dist. LEXIS 42042, *43 ........... 19

*Staten v. Vill. of Monticello,* No. 14-CV-4766 (KMK), 2016 WL 7235796, at *6 (S.D.N.Y. Dec. 13, 2016) ........... 12

*Walker v. Schult,* 365 F. Supp. 3d 266 (N.D.N.Y. 2019) ........... 11

*Westlake v. Lucas,* 537 F.2d 857 n.5 (6th Cir. 1976) ........... 8

*Weixel v. Bd. of Educ. City of N.Y.,* 287 F.3d 138 n.5 (2d Cir. 2002) ........... 17

*Williams v. Barometre,* 2022 U.S. Dist. LEXIS 55882, *39 ........... 21

*Wright v. N.Y. State Dep't of Corr.,* 831 F.3d 64 (2d Cir. 2016) ........... 17, 21

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

**COMES NOW** the Plaintiff Michelle Freudenberg ("Plaintiff"), as Administratrix of the Estate of Eric Freudenberg ("Mr. Freudenberg") deceased, and respectfully submits her Memorandum of Law in Opposition to Defendants County of Orange ("Orange County" or "County"); Wellpath, LLC (f/k/a Correct Care Solutions Medical Services PC) and Wellpath NY, LLC (collectively, "Wellpath"); Orange County Sheriff Carl E. Dubois, in his official capacity; Salwa Khouri, M.D. ("Dr. Khouri" or "Khouri"); and Mandi Zaccagnino, N.P.'s ("NP Zaccagnino" or "Zaccagnino") (collectively, "Defendants") Motion to Dismiss and Memorandum of Law In Support (Dkt. ##59-61), as follows:

<u>**Introductory Statement**</u>

On April 28, 2023, Plaintiff filed her Second Amended Complaint ("SAC") (Dkt. #21), setting forth specific, highly detailed and thorough allegations in support of her claims brought against Defendants. *See* Dkt. #21. As detailed in the SAC, Mr. Freudenberg needlessly suffered in unimaginable pain, for a period of months, at the Orange County Correctional Facility ("OCFC" or "Jail") while responsible medical staff employed by Wellpath, including Dr. Khouri and NP Zaccagnino, disregarded known, obvious and substantial risks to his health and safety. Plaintiff alleges, pursuant to 42 U.S.C. § 1983, that the treatment of Mr. Freudenberg constitutes deliberate indifference, in violation of his Fourteenth Amendment rights.

More specifically, as alleged in the SAC:

- Mr. Freudenberg was confined to OCCF in December 2018. He was there as a pre-trial detainee, incarcerated until June 2021 prior to his hospitalization and untimely death on July 3, 2021.

1

- Beginning in January 2019 until the time of his death Mr. Freudenberg made multiple requests for medical attention. His complaints consisted primarily of pain, bone pain, itchy skin, bloody noses, sore throat and he stated he was spitting up blood on a number of occasions. The aforementioned symptoms are consistent with symptoms of a person suffering from cancer.

- He made over two dozen complaints about pain and lumps on his body, from his records, including but not limited to: 1/05/19 - "pain in my bones" "on/off since 8/18" "so bad I want to die"; 1/19/19 - "want to get checked for cancer please" "bad bonepain";1/20/19 - "request for colon cancer test"; 1/18/19 - "want to get checked for cancer please" "severe pain in my bones": 1/19/19 - "This is my 5th request! Why am I not being seen? I am in pain!" "want to get checked for cancer".

- Mr. Freudenberg's complaints were made aware to all Defendants, however, they went largely unaddressed, except to provide him pain medication by Medical Defendants.

- Throughout Mr. Freudenberg's incarceration he received blood tests beginning in 2020 which began showing an elevated sedimentation rate. This elevated sedimentation rate was further evidence that he may have cancer.

- "In August of 2020 Mr. Freudenberg was seen by an ***endocrinologist who noted Mr. Freudenberg had an enlarged thyroid and thyroid nodules.*** The endocrinologist made specific reference that these additional symptoms may be the result of cancer and ***recommended a fine needle biopsy*** to which Mr. Freudenberg agreed."

- Upon information and belief, the fine needle biopsy was never scheduled by Defendants despite Mr. Freudenberg's over one hundred follow up requests that the biopsy be scheduled, blood results be obtained, etc.

- "On at least four separate occasions, January 12, 2019, February 21, 2020, February 29, 2020 and September 20, 2020, Mr. Freudenberg documented symptoms of ***spitting up blood, coughing blood*** and having blood in his nasal passage, including at least one occasion in which he informed Defendants that he was ***spitting up blood on a daily basis.***"

- On or about February 22, 2021, Mr. Freudenberg's blood work indicated his sedimentation rate was still high and revealed that ***his platelet level was now elevated***, as well, an additional sign that he may have cancer.

- On or about March 5, 2021, Mr. Freudenberg documented symptoms of sharp pains in the left side of his chest right near his heart.

- In late May or early June of 2021 Mr. Freudenberg was finally hospitalized after complaints of severe neck pain.

- Mr. Freudenberg was discharged on or about June 4, 2021 with a diagnosis of "bilateral cervical, supraclavicular mediastinal & hilar lymphadenopathy due to **probable poorly differentiated adenocarcinoma of lung origin** (based on tissue results) along w severe pain".

- On or about June 5, 2021, Mr. Freudenberg was again admitted to the hospital where he was diagnosed with intractable pain and a malignant neoplasm metastatic to a lymph node of his neck.

- Mr. Freudenberg died within a month. The cause of death was complications of stage IV lung cancer. He died on July 3, 2021.

- ■ Defendants violated Freudenberg's constitutional right to adequate medical care by their conduct in denying him lifesaving medical treatment and failing to provide medical treatment and said conduct was repugnant to the conscience of mankind and incompatible with the evolving standards of decency that mark the progress of a maturing society.

SAC at ¶¶ 114-165.

Plaintiff's allegations against Defendants easily meet the applicable "plausibility" standard. The Motion to Dismiss (Dkt. ##59-61) should be denied.[1]

## **Standard of Review**

To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup,* Inc., 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.,* 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Applying this standard of review, Plaintiff's allegations easily survive the Motion to Dismiss.

## **Discussion**

## **PROPOSITION:** **PLAINTIFF HAS ALLEGED SUFFICIENT FACTS TO STATE CLAIMS FOR RELIEF THAT ARE "PLAUSIBLE" ON THEIR FACE**

### A. **Plaintiff *Has* Plausibly Alleged That the "Individual Medical Defendants" Were Deliberately Indifferent to Mr. Freudenberg's Serious Medical Needs**

---

[1] Except where explicitly noted otherwise herein.

As alleged, Mr. Freudenberg was a pretrial detainee. *See, e.g.,* SAC at ¶ 2. A pretrial detainee's claim of "deliberate indifference to [a] serious threat to health or safety," such as the failure to treat a serious medical need, is "governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 19, 33 n. 9 (2d Cir. 2017). The distinction exists because pre-trial detainees "have not been convicted of a crime and thus may not be punished in any manner -- neither cruelly and unusually nor otherwise." *Iqbal v. Hasty,* 490 F.3d 143, 168 (2d Cir. 2007) (internal quotation marks omitted).

A pretrial detainee alleging deliberate indifference to serious medical needs under the Fourteenth Amendment must establish two elements, or "prongs": (1) that the detainee had a serious medical need; and (2) that the defendant "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or ***should have known***, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 30, 35 (emphasis added); *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019); *see also Walker v. Wright*, No. 17-cv-425, 2018 WL 2225009, at *5 (D. Conn. May 15, 2018) (noting that, while *Darnell's* holding was applied to a conditions of confinement claim, "[d]istrict courts in this Circuit have ... applied *Darnell's* objective '*mens rea*' prong to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment"). "In other words, the 'subjective prong' (or '*mens rea* prong') of a deliberate indifference claim [under the Fourteenth Amendment] is defined objectively." *Darnell*, 849 F.3d at 35.

Here, Plaintiff has adequately alleged both prongs of the deliberate indifference standard. Thus, the Individual Medical Defendants, Dr. Khouri and NP Zaccagnino, are not entitled to relief under Rule 12(b)(6).

As to the first prong, "[i]n determining whether a medical need is sufficiently serious to be cognizable as a basis for a constitutional claim for deprivation of medical care, [the Second Circuit] consider[s] factors such as whether a reasonable doctor or patient would find the injury important and worthy of treatment, whether the medical condition significantly affects an individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain." *Charles,* 925 F.3d at 86. Clearly, Mr. Freudenberg's condition at issue, lung cancer, was objectively sufficiently serious. Defendants do not argue otherwise. *See, e.g.,* Dkt. #61 at 6-12.

Plaintiff has also plausibly established the second prong. As previewed above, "a detainee asserting a Fourteenth Amendment claim for deliberate indifference" must allege "either that [1] the defendants knew that failing to provide the complained of medical treatment would pose a substantial risk to his health or [2] that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Charles,* 925 F.3d at 87 (emphasis added). Here, Plaintiff alleges that Dr. Khouri and NP Zaccagnino (collectively, the "Individual Medical Defendants") were employees of Defendant Wellpath and responsible for ensuring that Mr. Fruedenberg received adequate medical care. Plaintiff specifically alleges that Dr. Khouri was "responsible for denying MR. FREUDENBERG the care he needed, knew about the lapse in MR. FREUDENBERG'S medical care, and allowed it to continue uncorrected-medicating him with pain prescriptions and anti-anxiety drugs in order to stop his real and true complaints about the symptoms of cancer that he was experiencing." SAC at ¶ 2. For instance, Plaintiff alleges that Mr. Freudenberg repeatedly reported concerning signs of a life-threatening condition, including coughing and spitting up blood, and that these reports were largely ignored by medical staff at Orange County Correctional. *Id.* at ¶ 116-153. Most concerning, Plaintiff alleges that even after an endocrinologist determined that Mr. Freudenberg's symptoms may be the result of cancer, and recommended a biopsy, Dr. Khouri and NP Zaccagnino recklessly failed to schedule

the biopsy -- or otherwise act to assess or treat Mr. Freudenberg's worsening symptoms of lung cancer -- for approximately **10 months after** he saw the endocrinologist. *See, e.g., id.* at ¶¶ 135-153. She further alleges that Dr. Khouri and NP Zaccagnino were aware of an endocrinologist's finding that Mr. Freudenberg's symptoms were consistent with cancer and of the biopsy recommendation, but that Dr. Khouri and NP Zaccagnino failed to act on the recommendation while Freudenberg "continued to live in intolerable and excruciating pain while these symptoms grew worse, his cancer grew and eventually spread throughout his body." *Id.* at ¶ 5. Plaintiff states that Dr. Khouri and NP Zaccagnino "delayed, denied, or refused to provide MR. FREUDENBERG with the necessary treatment" despite approximately 100 written requests for medical attention, and complaints about the lack of care provided, over a two-year period. *Id.* at ¶ 6. *See also id.* at ¶¶ 135-136.

Plainly, these averments meet the threshold of "deliberate indifference." That is, at a minimum, Plaintiff has sufficiently alleged that Dr. Khouri and NP Zaccagnino "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to [Mr. Freudenberg] even though [they] knew, or *should have known*, that the condition posed an excessive risk to [Mr. Freudenberg's] health or safety." *See, e.g.,* SAC at ¶¶ 5-6, 116, 118-33, 136, 156-65.

Nevertheless, Defendants assert that "Plaintiff fails to allege facts supportive of a constitutional deprivation on the part of any of the Individual Medical Defendants." Dkt. #61 at 7. This argument lacks merit. Defendants particularly claim that the "'crux of Plaintiff's claim is ultimately that the Defendants misdiagnosed [Decedent's] symptoms and failed to provide a [diagnostic] test to detect . . . cancer sooner—but these allegations fail to provide a basis of an Eighth Amendment violation.'" Dkt. #61 at 8 (quoting *Grubbs v. Ngbodi*, No. 21-CV-02906 (NSR), 2022 WL 4072926, at *8 (S.D.N.Y. Sept. 2, 2022)). To begin with, because Plaintiff's claims sound in the Fourteenth Amendment, the question of whether the allegations "provide a basis of

an Eighth Amendment violation" is immaterial. More fundamentally, Plaintiff's allegations go far beyond a mere "misdiagnosis" of Mr. Freudenberg's symptoms. Rather, the allegations represent a reckless failure to act, for a period of months, despite known and dire warnings that he was suffering from a worsening and life-threatening condition, likely to be cancer. Though the case quoted by Defendants, *Grubbs v. Ngbodi*, applied the stricter Eighth Amendment standard and is, thus, inapposite, it is also otherwise distinguishable. In *Grubbs,* the Court found that "there [were] no factual allegations that [the defendants] knew or inferred that Plaintiff was at a serious risk of prostate cancer." *Grubbs*, 2022 WL 4072926, at *9. By contrast, here, Plaintiff alleges that the Individual Medical Defendants knew the endocrinologist determined that Mr. Freudenberg's symptoms may be the result of cancer and recommended a biopsy, and they still failed to act, for a period of months, all while Freudenberg's condition obviously deteriorated and despite his continual medical complaints and requests for treatment. Such allegations readily satisfy *Darnell*'s "should have known" standard.

Overall, it appears to be Defendants' position that because Mr. Freudenberg was "repeatedly seen by medical providers" (Dkt. #61 at 8), Plaintiff cannot state a claim of deliberate indifference. But the provision of *some* care, no matter how inadequate, does not absolve the Individual Medical Defendants from liability as a matter of law. Constitutional liability may arise where, as here, the treatment provided is "'so woefully inadequate as to amount to no treatment at all.'" *Burns v. Rensselaer Cnty.,* No. 919CV00701BKSCFH, 2021 WL 1091558, at *6–7 (N.D.N.Y. Mar. 22, 2021) (quoting *Johnson v. Wright,* 234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) ("Although federal courts are 'reluctant to second guess medical judgments and constitutionalize [medical malpractice claims]' where the prisoner has actually received medical treatment, deliberate indifference will be found where 'the medical attention rendered [was] so woefully inadequate as to amount to no treatment at all.'" (quoting *Westlake v. Lucas,* 537 F.2d 857, 860 n.5 (6th Cir. 1976))).

In Mr. Freudenberg's case, while he was prescribed medications for pain and anxiety, this was wholly and obviously inadequate in light of the known and clear signs that he was suffering from cancer.

Defendants' remaining arguments only underscore the weakness of their position. For instance, Defendants assert that "factual allegations of the SAC do not establish that either of the Individual Medical Defendants even knew about the endocrinologist's purported recommendation." Dkt. #61 at 9. Notably, this argument infers that if Plaintiff had alleged such knowledge, it could provide a basis for deliberate indifference. Of course, Plaintiff *has* alleged that the Individual Medical Defendants were aware of the endocrinologist's recommendation that a "biopsy be scheduled to determine whether MR. FREUDENBERG did in fact have cancer." SAC at ¶ 5.

Defendants next aver that "[e]ven assuming *arguendo* that either of the Individual Medical Defendants were notified of the endocrinologists' recommendation of a fine needle biopsy, the SAC is again silent as to whether they were ultimately the individuals responsible for performing the administrative function of scheduling the biopsy." Dkt. #61 at 9. This is a red herring. Whether Dr. Khouri and NP Zaccagnino had the ministerial duty of calling a specialist's office to schedule the procedure, as the Jail's prescribing medical professionals with knowledge of Freudenberg's declining state and the need for a biopsy, they had the clinical obligation to order the biopsy and ensure that the necessary procedures and treatment were provided.

To close out their argument, Defendants urge this Court to apply an inapplicable legal standard. Specifically, Defendants assert that "there are no allegations that the purported failure to schedule the biopsy was based upon the Individual Medical Defendants' *malice*, as opposed scheduling conflicts, or a difference in the medical opinions and conclusions of the Individual Medical Defendants as compared to the endocrinologist." Dkt. #61 at 10. Plaintiff is not required

to allege "malice" in order to establish deliberate indifference. Again, the pertinent question is whether "the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Charles,* 925 F.3d at 87 (emphasis added). And reading the SAC as a whole, even if one were to assume that the Individual Medical Defendants disagreed with the endocrinologist's recommendation, the failure to secure the biopsy in the face of Freudenberg's symptoms (including spitting and coughing up blood on a daily basis, enlarged thyroid and thyroid nodules and elevated platelet level) was reckless. Plaintiff need allege no more. *See, e.g., Darnell,* 849 F.3d at 30, 35.

In sum, Plaintiff has sufficiently alleged that Dr. Khouri and NP Zaccagnino "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to [Mr. Freudenberg] even though the [they] knew, or should have known, that the condition posed an excessive risk to [Mr. Freudenberg's] health or safety." The Motion to Dismiss the Individual Medical Defendants should be denied.

### B.     Plaintiff *Has* Adequately Pled a Municipal Liability -- or "*Monell*" -- Theory

Plaintiff's federal claims against Wellpath and the County are brought pursuant to a municipal liability -- or *Monell*[2] -- theory. "To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019). Plaintiff has alleged a plausible *Monell* theory in this case.

Ordinarily, for *Monell* liability to lie, the plaintiff must first establish an "underlying" violation of her constitutional rights. *See, e.g., Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir.

---

[2]     *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

2006). In the Motion to Dismiss, Defendants first argue that "Plaintiff does not allege an underlying depravation of Decedent's constitutional rights that could support a *Monell* claim in the first instance." Dkt. #61 at 12-13. However, as discussed in the previous subsection, which is fully adopted herein, Plaintiff has sufficiently alleged that multiple employees and/or agents of the County and Wellpath disregarded Mr. Freudenberg's condition despite the fact that they "knew, or should have known, that the condition posed an excessive risk to [his] health or safety." SAC at ¶¶132, 157, 160). As such, Plaintiff has alleged plausible "underlying violations" of Mr. Freudenberg's constitutional rights.

Moreover, Plaintiff has properly alleged the remaining elements of her *Monell* theory of liability. "[U]nlike state tort law, constitutional torts cannot be premised on a theory of *respondeat superior*." *Walker v. Schult*, 365 F. Supp. 3d 266, 284 (N.D.N.Y. 2019) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Therefore, "[b]efore a municipality can be held liable under § 1983, it must be shown to have been 'the moving force of the constitutional violation.'" *Carmichael v. City of N.Y.*, 34 F. Supp. 3d 252, 262-63 (E.D.N.Y. 2014) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)); *see also Cash v. Cty. of Erie*, 654 F.3d 324, 341-42 (2d Cir. 2011) (equating "moving force" with "proximate cause"). The *Monell* analysis also applies with respect to § 1983 claims against a private entity-- like Wellpath -- that provides medical care in a correctional setting. *See, e.g., Burns v. Rensselaer Cnty.*, No. 919CV00701BKSCFH, 2021 WL 1091558, at *7-9 (N.D.N.Y. Mar. 22, 2021)[3]; *Shomo v. City of New York*, 579 F.3d 176, 185 n.3 (2d Cir. 2009); *Bess v. City of New York*, No. 11 CIV. 7604 TPG, 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013); *Cruz v. Corizon Health Inc.*, No. 13-CV-2563, 2016 WL 4535040, at *8 n.11 (S.D.N.Y. Aug. 29, 2016).

Again, a civil rights plaintiff may establish *Monell* liability through evidence that a policy or

---

[3]     The *Burns* case involved a *Monell* claim asserted against Correct Care Solutions, which is now known as "Wellpath".

custom of the defendant caused the constitutional injury. *See, e.g., Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citation omitted). The requisite "policy may be pronounced or tacit and reflected in either action or inaction." *Cash*, 654 F.3d at 334; *see also Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) ("The policy or custom need not be memorialized in a specific rule or regulation."). "The inference that a policy existed may ... be drawn from circumstantial proof[.]" *Sanchez v. New York Correct Care Sols. Med. Servs.*, P.C., No. 16-CV-6826 CJS, 2018 WL 6510759, at *9 (W.D.N.Y. Dec. 11, 2018) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991); and *Staten v. Vill. of Monticello*, No. 14-CV-4766 (KMK), 2016 WL 7235796, at *6 (S.D.N.Y. Dec. 13, 2016) ("At the motion to dismiss stage, Plaintiffs need not prove these elements, but they are required to plead them sufficiently to make out a plausible claim for relief. To do so, Plaintiffs must allege facts tending to support, at least circumstantially, an inference that a municipal policy or custom exists.")).

Dismissal of a *Monell* theory is unwarranted where, as here, a defendant has provided constitutionally inadequate medical care and services as a cost-savings measure. *See, e.g., Carter v. Broome Cnty.*, 394 F. Supp. 3d 228, 240–42 (N.D.N.Y. 2019); *McNeil v. Corr. Med. Care, Inc.*, No. 918CV0894LEKDJS, 2019 WL 4415528, at *9 (N.D.N.Y. Sept. 16, 2019); and *Burns*, 2021 WL 1091558, at *9 (citing *Ceparano v. Suffolk Cnty. Dep't of Health*, 485 F. App'x 505, 508–09 (2d Cir. 2012) (finding that the plaintiff adequately alleged a municipal policy of providing inadequate medical care for the "purpose of saving money" where the plaintiff alleged that he had a spinal condition for which surgery had been scheduled prior to incarceration and that the correctional facility's nurse practitioner, who he saw "on several occasions," *refused to provide more than conservative treatment*, refused to continue pain medication prescribed by prison doctor, and *refused to pursue the required surgery* or obtain medical records from the plaintiff's treating orthopedist). It has also been recognized that dispositive relief on a plaintiff's *Monell* claim is "inappropriate if a fact-finder could

find 'systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system' and that 'a policy-making official knows about them and fails to correct them.'" *Carter,* 394 F. Supp. 3d at 242 (quoting *Dixon v. Cty. of Cook,* 819 F.3d 343, 348 (7th Cir. 2016)).

Plaintiff has sufficiently alleged, *inter alia,* that Wellpath has a practice of providing dangerously deficient health care at the Jail, and other facilities, as a cost-savings measure and to maximize profits. *See, e.g.,* SAC at ¶¶ 100-112, 137, 174. Plaintiff further specifically alleges that the County, Wellpath, Sheriff and Dr. Khouri have engaged in a pattern of: (A) "failing to develop and implement … appropriate medical screening instruments that identify observable and non-observable medical needs, including chronic diseases, and ensure timely access to a physician when presenting symptoms require such care"; (B) "failing to provide access to health care, ensure inmates have adequate access to health care, ensure that the medical request process for inmates is adequate and provides inmates with adequate access to medical care"; and (C) "failing to ensure that treatment and administration of medication to inmates is implemented in accordance with generally accepted professional standards of care." *Id.* at ¶¶ 99-101. Plaintiff supports these allegations, in part, with the findings of "medical neglect, abuse, and retaliatory withholding of care" after an investigation -- by Catholic Charities Community Services and other entities -- of medical care provided at OCCF. *Id.* at ¶¶ 110-111. Pertinently, as alleged, Catholic Charities found that:

- Other detainees at OCCF "have to submit 'four or five sick calls' to get the attention of staff, and 'go without medication for two or three weeks' due to gaps in prescription refills";

- "Not only do sick calls and medication requests generally go unanswered, but OCCF also fails to give detained people copies of their requests, making it harder for them to keep a record of the number of times they have asked for help";

- ■ "'Painkillers regularly substitute for actual care, even when medically inappropriate or inadequate'";

- ■ Another detainee's "'medical records revealed that despite measurements of elevated liver enzymes indicative of liver disease, OCCF failed to conduct any additional testing, leaving the individual at risk of chronic liver damage'"; and

- ■ Numerous other detainees at OCCF have been deprived of medically necessary care, including diagnostic procedures such as biopsies, despite the obvious and urgent need.

*Id.* Other courts have pointed to similar investigative reports and audits in denying dispositive motions on *Monell* claims. *See, e.g., Carter,* 394 F. Supp. 3d at 241; *Kucharczyk v. Westchester Cnty.,* 95 F. Supp. 3d 529, 544–45 (S.D.N.Y. 2015). *See also Burke v. Regalado,* 935 F.3d 960, 987-88, 999-01 (10th Cir. 2019) (finding sufficient evidence to support jury's verdict on *Monell* claim based, in part, on findings from certain audits conducted by the National Commission on Correctional Health Care ("NCCHC"), Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") and a jail's internal auditors).

As part of their Motion to Dismiss, Defendants argue that "aside from Decedent's own individual experience, Plaintiff offers nothing more than a broad array of dissimilar incident in disparate jails across the country, based upon unverified and unsubstantiated complaints and lawsuits referenced in news articles regarding Wellpath generally." Dkt. #61 at 14. This argument should be rejected. As a starting point, while Defendants suggest otherwise, Mr. Freudenberg's "own individual experience" *does* provide a basis for *Monell* liability. As the Court observed, held and reasoned in *Sanchez*:

> [T]he Court finds that the allegations are sufficient at the pleading stage to state a Monell claim against the Correct Care companies[4] and Ross involving Sanchez's death. On this point, it is of course clear that "as a general matter," "a municipal policy cannot be inferred from a single incident of illegality." *Carlisle v. City of Yonkers,* 104 F.3d 352 (2d Cir. 1996) (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985) ). This general rule, though, does not apply if "proof of the incident

---

4      Like the *Burns* case, *Sanchez* also involves Correct Care Solutions, now known as Wellpath.

includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. at 824. This action arguably involves not just a single incident, but **a series of incidents involving separate actors [toward the plaintiff] over a period of at least twelve hours.** Indeed, as discussed below **it is the consistency of these separate actors' conduct throughout this period which, in part, suggests the existence of a policy.** However, even if the action involves a single incident within the meaning of *City of Oklahoma City v. Tuttle*, the Second Amended Complaint includes factual allegations from which the existence of a policy could be inferred.

2018 WL 6510759, at *11 (emphasis added). *See also Burns* 2021 WL 1091558, at *9 (citing *Sanchez* with approval). Similarly, Plaintiff in the case-at-bar alleges that Mr. Freudenberg was subjected to a continuing pattern of inattentive and wholly inadequate care by multiple Wellpath employees. *See, e.g.,* SAC at ¶¶ 117-153. For example, Plaintiff alleges that, "the fine needle biopsy was never scheduled … despite over one hundred follow up requests that the biopsy be scheduled, blood results be obtained, etc" and "documented symptoms of spitting up blood, coughing blood and having blood in his nasal passage, including at least one occasion in which he informed Defendants that he was spitting up blood on a daily basis…." *Id.* at ¶¶ 135-138. These are allegations, in and of themselves, of systemic and reckless neglect sufficient to establish a policy or custom.

But Plaintiff's allegations are not limited to Mr. Freudenberg's "own individual experience". As summarized above, Plaintiff's allegations of a policy or custom of failing to provide necessary medical care as a cost-saving measure and the allegations of systemic and gross deficiencies in medical procedures are sufficient to state a *Monell* claim.

The primary authority cited by Defendants in support of their *Monell*-based arguments -- *Iacovangelo v. Corr. Med. Care, Inc.,* No. 13-CV-6466 CJS, 2014 WL 4955366, at *1 (W.D.N.Y. Oct. 2, 2014), *aff'd in part, vacated in part, remanded,* 624 F. App'x 10 (2d Cir. 2015) -- is inapposite and distinguishable. In the Motion to Dismiss, Defendants posit that, like the plaintiff in *Iacovangelo*, Plaintiff here relies only on dissimilar incidents from a "hearsay newspaper article" to support her

assertion of *Monell* liability. As summarized above, however, Plaintiff's allegations of a policy or custom here are well-supported and far more specific than those in *Iacovangelo*. The findings of the Catholic Charities Community Services, for instance, are much more than a "hearsay newspaper article". And the experiences of the inmates summarized in the Catholic Charities Community Services report (*i.e.*, medical staff ignoring sick call requests, painkillers regularly substituting for actual care, and the failure to provide diagnostic testing -- such as a biopsy -- despite the clear and urgent need) mirror those of Mr. Freudenberg.

In sum, Plaintiff's *Monell* allegations are more than adequate to survive a challenge under Rule 12(b)(6).

### C.  Plaintiff Has No Intention of Pursuing a *Monell* Claim Against the Individual Medical Defendants. However, the Sheriff Can be Sued in His "Official Capacity".

As counsel for Plaintiff has expressed to counsel for Defendants -- and to the Court during the pre-motion conference -- Plaintiff is agreeable to dismissing any *Monell* claims against the Individual Medical Defendants, to the extent such claims have been brought. The Sheriff is sued in his official capacity. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). *See also Gleeson v. Cnty. of Nassau*, No. 15CV6487AMDRL, 2019 WL 4754326, at *13 (E.D.N.Y. Sept. 30, 2019) ("A suit against Sheriff Sposato in his official capacity will be treated and analyzed as a suit against Nassau County…."). While Plaintiff's claims against the Sheriff in his official capacity are arguably duplicative of the *Monell* claim against the County, Defendants offer no such argument.

### D.  Plaintiff Has No Intention of Pursuing any "Supervisory Liability" Claim

As counsel for Plaintiff has expressed to counsel for Defendants -- and to the Court during the pre-motion conference -- Plaintiff is agreeable to dismissing any supervisory liability claims, to

the extent such claims have been brought.

### E. Plaintiff Has Adequately Pled ADA and Section 504 Claims Against the County and Wellpath

To establish a claim under Title II, a plaintiff must demonstrate "(1) she is a 'qualified individual' with a disability, (2) that [Defendants] are subject to the statutes, and (3) that Plaintiff was denied the opportunity to participate in or benefit from Defendants' services, programs or activities, or was otherwise discriminated against by Defendants, by reason of her disabilities.'" *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (citing *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998)). See, *Marino v. City Univ. of N.Y.*, 18 F. Supp. 3d 320, 342. Because the standards under both the ADA and Section 504 "are generally the same . . . [courts] treat claims under the two statutes identically." *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).

Here, Defendants do not challenge the first prong -- *i.e.*, that Mr. Freudenberg was a qualified individual who had the disability of a mental illness. They challenge the second prong, asserting that Wellpath is not subject to the statutes. They also challenge prong 3, arguing that Mr. Freudenberg was not denied the opportunity to participate in the benefit or program of health services because of his mental illness and was not otherwise discriminated against because of his mental illness.

With respect to the first argument, Plaintiff alleges that Wellpath receives federal funding (SAC at ¶ 192), and readily available public information does indicate such.[5] "[W]here public records that are integral to a . . . complaint are not attached to it, the court, in considering a Rule 12(b)(6) motion, is permitted to take judicial notice of those records." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

---

[5] *See:*
https://www.usaspending.gov/award/CONT_AWD_15B50223F00000134_1540_15B50219D
00000001_1540, last visited 1/4/2024

A private corporation receiving federal funding is subject to the Rehabilitation Act. *See*, *Weixel v. Bd. of Educ. City of N.Y.*, 287 F.3d 138, 146 n.5 (2d Cir. 2002); 29 U.S.C. § 794 (applying Rehabilitation Act to "any program or activity receiving Federal financial assistance"), and *J.R. v. N.Y. City Dep't of Educ.*, 2015 U.S. Dist. LEXIS 110366, *12 ("Section 504, however, applies to [Defendant] as an entity which receives '[f]ederal financial assistance.'").

Concerning the third prong, it is well-established that "[p]laintiffs who allege violations under the ADA . . . , and [Section 504] may proceed under any or all of three theories: disparate treatment, disparate impact, and failure to make reasonable accommodation." *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002). Plaintiff here pleads facts under both theories (1) disparate treatment and (3) failure to make reasonable accommodations. *See* SAC at ¶¶ 177-195.

Defendants cast Plaintiff's ADA/Section 504 allegations as concerning the adequacy of the medical treatment provided by Defendants, abandoning arguments against Plaintiff's reasonable accommodation claim. Defendants posit the SAC "fails to sufficiently allege disparate treatment" (D Memo at 19(b)) yet point to Plaintiff's reasonable accommodations pleadings (SAC ¶ 187) as support. Nowhere else is the reasonable accommodation argued in Defendants' brief. Plaintiff's reasonable accommodation claim must, therefore, proceed. *See Khatri v. Garland*, 2023 U.S. App. LEXIS 497, *3, *citing Yueqing Zhang v. Gonzales*, 426 F.3d 540, 541 n.1 (2d Cir. 2005) (issues not argued in briefs are waived).

Plaintiff is suing under the ADA and Section 504, in part, because Mr. Freudenberg did not receive medical treatment due to discrimination he faced for being mentally ill. Such discrimination squarely falls under the purposefully detailed language of 28 C.F.R. §35.130(b)(1)(i)-(vii) stating seven types of denials falling under a disparate treatment theory. Plaintiff's claims fall under parts i-iii of these statutorily provided rights.

Mr. Freudenberg's mental illness made him especially vulnerable to the very discrimination the statues were designed to prohibit. Patients with mental illnesses who have physical health issues are frequently deemed too disabled to provide input or make autonomous decisions for their care.[6] Courts sometimes face almost identical facts- and pleadings, where due to a mental health diagnosis, a plaintiff's health concerns were dismissed, and access to those services not granted. In cases, such as these, courts find for similarly situated plaintiffs. *See, Smith v. NaphCare Inc.*, 2023 U.S. Dist. LEXIS 42042, *43. In *Earl v. Espejo*, 2017 U.S. Dist. LEXIS 137398, *10-1, the court found that the denial of access to a plaintiff's health services, itself, was all that was necessary at the pleading stage to allege discrimination by reason of his mental illness.

Plaintiff alleges, "Mr. Freudenberg was discriminate[d] against… because of his disability." (SAC ¶ 184), That Freudenberg, "by reason of his disability", was denied benefits (SAC ¶ 185). *See* this Court's opinion in *Elbert v. New York State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 596, providing detailed instruction on the nuances to discern such. Within a month of Mr. Freudenberg's December 2018 entry to OCCF, in January 2019 (SAC ¶119), he complained of health issues (SAC ¶115). By January 19, 2019 he had already made over five requests and still had not been seen by health professionals, this despite the fact that he had documented symptoms

---

[6]     For a list of scholastic articles on this phenomena please see, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5347358/ , and Abbey S, Charbonneau M, Tranulis C, Moss P, et al. Stigma and discrimination. *Can J Psychiatry*. 2012;56(10):1–9. [PubMed] [Google Scholar]
2. Henderson C, Noblett J, Parke H, et al. Mental health-related stigma in healthcare and mental health–care settings. *Lancet Psychiatry*. 2014;1(6):467–482. [PubMed] [Google Scholar]
3. Knaak S, Ungar T, Patten S. Mental illness stigma as a quality of care problem. *Lancet Psychiatry*. 2015;2(10):863–864. [PubMed] [Google Scholar] 4. Stuart H, Arboleda-Flórez J, Santorius N. *Paradigms Lost: Fighting Stigma and the Lessons Learned*. New York, NY: Oxford University Press; 2012. [Google Scholar]
5. Thornicroft G, Rose D, Kassam A. Discrimination in health care against people with mental illness. *Int Rev Psychiatry*. 2007;19(2):113–122. [PubMed] [Google Scholar]).

of spitting up blood (SAC ¶138). He was prescribed to get bloodwork done but was denied (SAC ¶ 118), tests ordered but not done by lab (SAC ¶117). Plaintiff has alleged that though these serious and urgent health conditions were known by Defendants, they were not addressed (SAC ¶121), and most importantly, that they were done in disregard to him because of his mental illness disability- assuming he did not know what was going on with his body because he was mentally ill. He was highly medicated with three different types of drugs for him to stop complaining about his obvious health conditions that required immediate health treatment (SAC ¶¶122-124).

Defendants rely on cases that do not correlate with the facts pled: *Hardy v. Diaz Us. Dist. LEXIS 39295 (N.D.N.Y. March 30, 2010,* and *Sims v. City of New York*, 2018 U.S. Dist. LEXIS 212966) In these cases, the plaintiffs were not alleging discrimination because of their disability, but rather the treatment of their disability. In *Hardy*, the *pro-se* plaintiff, who suffered from HVC, had alleged that his HVC was not adequately treated. The Northern District of New York, cited an Ohio District Court case for the proposition that the ADA did not apply where "Plaintiff is only challenging the medical treatment of his underlying medical condition." Here, Plaintiff is not challenging the treatment of his mental health condition under the ADA. He is challenging the discrimination he faced because of it, including and very important to the facts of this case, the denial to health services.[7] "Medical treatment is a 'service' under the ADA." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210, 118 S. Ct. 1952, 141 L. Ed. 2d 215 (1998).

The Court in *Sims* specifically makes the distinction that had the plaintiff in that case claimed he was not adequately treated *because of* his mental illness (as Plaintiff does here), then his claim would have been actionable under the statute. "Moving Defendants argue that Plaintiff claims 'that his psychiatric condition was not adequately treated, not that he was treated

---

[7] The pleadings are sufficient to address discrimination from any and all such programs and services. *Lacayo v. Donahoe*, 2015 U.S. Dist. LEXIS 26621, *54.

inadequately because of his psychiatric condition,' and that, therefore, his claim is not actionable under these statutes. The Court agrees."

Defendants write "the fact that decedent was disabled and received what plaintiff alleges was inadequate treatment, does not amount to an ADA or RA claim." (Dkt. #61 at 20) Actually, that is incorrect. It is not enough that Plaintiff received *some* treatment, despite a disability. The key is *adequate* treatment, not *any* treatment. *See, Williams v. Barometre*, 2022 U.S. Dist. LEXIS 55882, *39. The Court explains distinctions at length, concluding there is an ADA violation where treatment was *inadequate* because of discrimination due to a disability.

Whether an accommodation is reasonable is generally a question of fact, precluding resolution on summary judgment. "The question of whether a proposed accommodation is reasonable is fact-specific and must be evaluated on a case-by-case basis", *Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122 (2d Cir.1999). In case this Court reads Defendants as having addressed Plaintiff's reasonable accommodation claim, Plaintiff will argue it briefly.

"In evaluating an accommodation claim, the Court asks 'whether a plaintiff with disabilities as a practical matter was denied meaningful access to services, programs or activities to which he or she was legally entitled.' *Wright v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 831 F.3d 64, 72 (citation and quotation marks omitted). Similar to disparate treatment, an absolute denial need not be pled, rather "[a] plaintiff need not demonstrate that [he] is entirely precluded from accessing a benefit; rather, difficulty in accessing a benefit is sufficient to sustain a reasonable accommodation claim." *Scalercio-Isenberg v. Port Auth. of N.Y. & N.J.*, 487 F. Supp. 3d 190, 201 (S.D.N.Y. 2020); *see also Paschal-Barros v. Quiros*, 2022 U.S. Dist. LEXIS 6641, *22.

"To plead a failure to make a reasonable accommodation, a plaintiff must allege that 'disabled individuals lack access to a given government resource and suggest a plausible method for remedying that lack of access.' *Meekins v. City of New York*, 524 F. Supp. 2d 402, 407 (S.D.N.Y.

2007). 'A plausible accommodation is one 'the costs of which, facially, do not clearly exceed its benefits.'" *Id.* (quoting *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)). *Bolden v. Westchester Cnty. N.Y. Bd. of Ethics*, 2023 U.S. Dist. LEXIS 102266, *37. Paragraph 187 of the SAC highlights four ways that were thoroughly detailed in the facts section, where Mr. Freudenberg was unable to access health services. The SAC alleges he could have easily been given access to health programs, been furnished with the appropriate care where necessary, and given consideration for his requests in determining what type of aid and/service was necessary. (SAC ¶188).

The ADA/RA claims should not be dismissed.

### F. Defendants Failed to Raise Any Argument Concerning Dismissal of the Wrongful Death Claim in Their August 17, 2023 Pre-Motion Letter. As Such, the Argument, as Asserted in the Motion to Dismiss, Should be Disregarded.

As part of the Motion to Dismiss, Defendants now assert that Plaintiff has failed to state a claim for wrongful death. *See* Dkt. #61 at 21. This argument was not previously raised by Defendants in their August 17, 2023 Pre-Motion Letter. *See* Dkt. #36. As this Court's Individual Rules of Practice provide:

> For motions to dismiss in lieu of an answer in fully counseled cases, the movant must send a pre-motion letter to the nonmovant, copy the Court, and file it on the docket. The letter ***shall include each specific argument and relevant case law supporting the movant's position*** as to why the complaint may fail or partially fail as a matter of law.

Individual Rules of Practice of the Honorable Kenneth M. Karas(II)(A) (emphasis added). Because Defendants did not include their wrongful death dismissal arguments or supporting case law in the Pre-Motion Letter, Plaintiff was not given the opportunity to confer with Defendants or the Court on the issue, and was not provided a chance to amend. The new, and unexhausted, wrongful death arguments and authorities, as stated in the Motion to Dismiss, should be disregarded.

### G. Plaintiff Concedes that *Respondeat Superior* Does Not Apply in the Section 1983 Context. Plaintiff Agrees that *Respondeat Superior* is Not a Separate Cause of Action.

Unlike claims brought pursuant to § 1983, where there is no vicarious liability, when a plaintiff brings state law tort claims, counties may be held liable "under a *respondeat superior* theory." *Crews v. Cnty. of Nassau*, 996 F. Supp. 2d 186, 212 (E.D.N.Y. 2014) (citing *Castro v. Cnty. of Nassau*, 739 F.Supp.2d 153, 184 & n. 27 (E.D.N.Y.2010)). Thus, Plaintiff's state law tort claims against the County, **based on** *respondeat superior*, should not be dismissed.

Nonetheless, as stated during the pre-motion conference, Plaintiff concedes that *respondeat superior* is not a separate cause of action, and agrees to its dismissal as a separate cause of action.

WHEREFORE, premises considered, Plaintiff respectfully requests that the Court deny Defendants Motion to Dismiss (Dkt. ##59-61).

Respectfully submitted,

/s/Robert M. Blakemore
Daniel E. Smolen, OBA#19943 (Pro Hac Vice)
Robert M. Blakemore, OBA #18656 (Pro Hac Vice)
Bryon D. Helm, OBA #33003 (Pro Hac Vice)
SMOLEN & ROYTMAN
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

-and-

P. JENNY MARASHI, ESQ.
930 Grand Concourse, Suite 1E
Bronx, NY 10451
917-703-1742
Marashi.legal@gmail.com

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of January 2024, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.


/s/Robert M. Blakemore