UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHELLE FREUDENBERG, *as
Administratrix of the Estate of Eric
Freudenberg*,

                              Plaintiff,

        v.

COUNTY OF ORANGE, WELLPATH NY
LLC, CARL E. DUBOIS, SALWA KHOURI,
MANDI ZACCAGNINO, *and* JOHN DOES
1–10,

                              Defendants.

No. 23-CV-847 (KMK)

OPINION & ORDER

Appearances:

Bryon Helm, Esq.
Daniel Elliot Smolen, Esq.
Robert M. Blakemore, Esq.
Smolen & Roytman
Tulsa, OK
*Counsel for Plaintiff*

Poupa Jenny Marashi, Esq.
Law Office of P. Jenny Marashi
Bronx, NY
*Counsel for Plaintiff*

Paul Andrew Sanders, Esq.
Barclay Damon LLP
Rochester, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Michelle Freudenberg ("Plaintiff") brings this Action as administratrix of the estate of her

son Eric Freudenberg, against the County of Orange (the "County"), Wellpath NY LLC

("Wellpath"), John Doe officers 1–10, Salwa Khouri, Mandi Zaccagnino, (together with Does 2–

10, the "Medical Defendants"), and Orange County Sheriff Carl E. DuBois in his individual and

official capacities (collectively, "Defendants").  As relevant to this Opinion, Plaintiff alleges,

pursuant to 42 U.S.C. § 1983, that Defendants violated Mr. Freudenberg's constitutional rights

and that they discriminated against him in violation of the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101 et seq.  Plaintiff also brings a state law claim for wrongful death.

(*See generally* Second Am. Compl. ("SAC") (Dkt. No. 21).)  Before the Court is Defendants'

Rule 12(b)(6) Motion To Dismiss.  (Not. of Mot. (Dkt. No. 59).)  For the following reasons, the

Motion is granted in part and denied in part.

I.  Background

A.  Factual Background

The following facts are drawn from the SAC and are assumed to be true for the purposes

of resolving the instant Motion.  *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension*

*Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

This case arises out of a tragic series of events culminating in Eric Freudenberg's death

from lung cancer on July 3, 2021.  Beginning in December 2018, and at all times relevant to this

Action, Mr. Freudenberg was a pretrial detainee housed at the Orange County Correctional

Facility ("OCCF").  (SAC ¶¶ 2, 20.)  Also relevant is the fact that he was diagnosed with Bipolar

1, which is alleged to be a "mental health disability."  (*Id*. ¶ 2.)

Orange County Correctional Facility is operated by the County of Orange (the "County")

and during the events giving rise to this case, Defendant DuBois served as Sheriff.  (*Id*. ¶ 21.)

The County contracted with Wellpath—a private Tennessee corporation—for the purpose of providing medical care and treatment for OCCF inmates and detainees. (*Id.* ¶¶ 28–29, 31.)[1]

Two Wellpath, and by extension, OCCF, employees feature prominently in this case. Defendant Khouri acted as OCCF's Medical Director and had the responsibility of ensuring OCCF inmates, including Mr. Freudenberg, received necessary medical care. (*Id.* ¶¶ 76–79.) Important too is Defendant Zaccagnino, a member of OCCF medical staff who Khouri supervised and who was likewise responsible for providing care to OCCF inmates. (*Id.* ¶¶ 80–86.)[2]

### 1. Mr. Freudenberg's Symptoms & Requests for Care

Starting in 2019, Mr. Freudenberg began to report alleged cancer symptoms to OCCF medical staff. For instance, he registered several complaints in January 2019 regarding "lumps on his body" and "pain in [his] bones" that was "so bad [he] want[ed] to die." (SAC ¶¶ 119–20 (covering five such complaints).) On at least four separate occasions Mr. Freudenberg also reported that he was "spitting up blood," sometimes "on a daily basis." (*Id.* ¶¶ 120, 138.) Those reports continued through June 2020—Mr. Freudenberg repeatedly flagged a "lump on [his] head" and referenced "extreme pain [in his] right shoulder area." (*Id.* ¶¶ 120, 129 (covering eight alleged complaints from May and June 2020).) Throughout that time, Mr. Freudenberg received blood tests showing an elevated sedimentation rate about which he expressed concerns and which Plaintiff alleges were yet another sign of cancer. (*Id.* ¶¶ 127–28, 134.) In short,

---

[1] For the purposes of this Motion, Defendants do not contest that Wellpath executives and individuals employed to deliver medical care to inmates are state actors acting under color of law pursuant to Section 1983. (*See*, SAC ¶¶ 40–41.)

[2] Doe Defendants 2–10 are also alleged to be members of OCCF medical staff involved in providing medical care to Mr. Freudenberg. (SAC ¶¶ 88–94.)

Mr. Freudenberg was concerned that "something [was] seriously wrong with [his] body." (*Id*. ¶ 120)

Mr. Freudenberg accompanied many of these reports with requests to be "checked for cancer." (*See id*. ¶ 119.) And he also indicated that "cancer r[an] in [his] family," as his "dad[, ] uncle, [and] sister all died from cancer." (*Id*. ¶ 120.)

In addition to these reports—which Medical Defendants allegedly had access to— Mr. Freudenberg had dozens of visits with Khouri, Zaccagnino, and Does 2–10, where they could observe his symptoms. (*Id*. ¶¶ 130–31.)

Nevertheless, Defendants allegedly did not address these complaints other than by providing Mr. Freudenberg pain and anti-anxiety medication. (*Id*. ¶¶ 121–22.)[3] Indeed, Defendants apparently prescribed him so much pain medication that they caused Mr. Freudenberg to be admitted to a hospital for an ulcer. (*Id*. ¶ 125.)

In an August 8, 2020, visit, Khouri again observed Mr. Freudenberg's symptoms and "misdiagnosed" those symptoms, and the side effects from his pain medication, as hypothyroidism. (*Id*. ¶ 130.) More generally, Plaintiff alleges that despite Mr. Freudenberg's worsening symptoms, Khouri, Zaccagnino, and others, repeated that misdiagnosis in order to "brush off his complaints" and because they thought Mr. Freudenberg "did not know what was going on in his body because of his disability. (*Id*. ¶¶ 132, 187.)

---

[3] Plaintiff asserts that Defendants prescribed Mr. Freudenberg a cocktail of anti-anxiety medications and anti-depressants in an effort "to quiet his complaints" and "put him into a stupor." (SAC ¶¶ 122, 124.)

### 2.  Mr. Freudenberg's Biopsy Request

Mr. Freudenberg eventually saw an outside endocrinologist.[4]  The endocrinologist noted Mr. Freudenberg had an enlarged thyroid and made "specific reference" that his symptoms may be the result of cancer.  (*Id*. ¶ 135.)  Accordingly, the endocrinologist recommended a fine needle biopsy to which Mr. Freudenberg agreed.  (*Id*.)

The endocrinologist made that recommendation "to the staff at [OCCF], including but not limited to Defendants Doe 1, Khouri, Zaccagnino and Doe 2."  (*Id*. ¶ 5.)  Yet, despite "over one hundred follow up requests" in the ensuing 10 months, Medical Defendants did not schedule a biopsy.  (*Id*. ¶ 136.)

On March 5, 2021, Mr. Freudenberg again documented sharp pains in the left side of his chest near his heart.  (*Id*. ¶ 140.)  Later, in late May or early June 2021, Mr. Freudenberg was hospitalized after further reports of pain in his neck.  (*Id*. ¶ 141.)  He was discharged on June 4, 2021, with a diagnosis of "bilateral cervical, supraclavicular mediastinal [and] hilar lymphadenopathy due to probable poorly differentiated adenocarcinoma of lung origin."  (*Id*. ¶ 142 (emphasis omitted).)  The next day, Mr. Freudenberg was readmitted to the hospital and diagnosed with "a malignant neoplasm metastatic to a lymph node of his neck."  (*Id*. ¶ 143.)

Mr. Freudenberg passed away roughly one month later, on July 3, 2021.  The cause of death was "complications of stage IV lung cancer."  (*Id*. ¶ 144.)

### 3.  Wellpath's Alleged Pattern of Inadequate Care

Apart from this particular case, Plaintiff alleges that Wellpath has a pattern of providing inadequate care at facilities it services across the country.  In particular, she alleges that

---

[4] Plaintiff states that this visit occurred "[i]n August of 2020," but does not address whether it came before or after Khouri's alleged misdiagnosis.  (SAC ¶ 135.)  Also unclear is whether one of the Medical Defendants referred Mr. Freudenberg to the outside specialist.

Wellpath's predecessor, Correct Care Solutions, had been sued 1,395 times in federal court as of September 12, 2019. (*Id*. ¶ 104.)[5]  Further, Plaintiff references investigative reports by CNN and The Atlantic detailing alleged inadequacies in medical care because of a focus on cost cutting. (*See id*. ¶¶ 105–09.)[6]

Plaintiff also incorporates by reference a letter from Catholic Charities Community Services raising complaints of "medical neglect, abuse, and retaliatory withholding of care." (*Id*. ¶ 110.)[7]  The letter goes on to state, among other things, that care at OCCF has been described as "poor," "bad," and "slow"; that "[p]ainkillers regularly substitute for actual care, even when medically inappropriate or inadequate"; and that, according to "[r]eports," OCCF "deprives detained people of access to critical treatment such as outpatient care." (*Id*. ¶ 111.)

B.  Procedural History

Defendants filed a pre-motion letter seeking leave to file the instant Motion on August 17, 2023. (Letter from Paul A. Sanders, Esq., to Court (Aug. 17, 2023) ("Defs' Pre-motion Letter") (Dkt. No. 36).)  Plaintiff responded on August 24, 2023, (Dkt. No. 37), after which the Court held a pre-motion conference and adopted a briefing schedule, (*see* Order (Dkt. No. 43)). After an extension, (Dkt. No. 58), Defendants moved to dismiss on December 4, 2023. (Not. of Mot. (Dkt. No. 59); Mem. of Law in Supp. of Defs' Pre-Answer Mot. ("Defs' Mem.") (Dkt.

---

[5] Plaintiff references a report from the "Project on Government Oversight," but neither cites that report, nor provides any basis for its finding, so the Court treats this statement just like any other allegation.

[6] Other than providing a link to the article in The Atlantic, Plaintiff does not quote or discuss its findings in the SAC or her papers. (*See generally* SAC; Pl's Mem. of Law in Opp. to Defs' Mot. ("Pl's Mem.") (Dkt. No. 64).)

[7] The full letter is available at: https://law.nyu.edu/sites/default/files/OCCF%20Multi-Organization%20DHS%20CRCL%20Complaint%20and%20Index_2%2017%202022.pdf [https://perma.cc/WL4M-3Y8A].

No. 61).) Plaintiff filed her Opposition on January 17, 2024, after another extension, (*see* Order (Dkt. No. 63); Pl's Mem. of Law in Opp. ("Pl's Mem.") (Dkt. No. 64)), and Defendants replied on February 2, 2024, (Reply Mem. of Law in Supp. of Mot. ("Defs' Reply") (Dkt. No. 65)).

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration adopted) (internal quotation marks and citation omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration adopted) (internal quotation marks and citation omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570. However, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" (alteration adopted) (internal quotation marks and citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Protection Resources, Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B. Analysis

Defendants move to dismiss Plaintiff's claims of deliberate indifference, ADA discrimination, municipal liability, and wrongful death. (*See generally* Defs' Mem.)[8] The Court addresses each claim in turn.

---

[8] The Motion's scope has narrowed somewhat. Defendants initially moved to dismiss several other claims that they gleaned from the SAC, but Plaintiff clarified in response that she was not pursuing a *Monell* claim against any individual defendants, a "supervisory liability" claim, or a respondeat superior theory under Section 1983. (*See* Pl's Mem. 16–17, 22.)

1.  Deliberate Indifference

a.  Legal Framework

To establish a deliberate-indifference claim under the Fourteenth Amendment's Due Process Clause—which applies to pre-trial detainees—a plaintiff must establish: "(1) that the 'deprivation of medical care was sufficiently serious,' and (2) that the defendant 'acted or failed to act with 'a sufficiently culpable state of mind.'" *Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 395 (S.D.N.Y. 2020) (alterations adopted) (quoting *Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017)); *accord Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The first element calls for evidence that the detainee "was actually deprived of adequate medical care" and that the deprivation was "sufficiently serious," i.e., that it gave rise to "an unreasonable risk of serious damage to [the detainee's] health." *Pateman v. City of White Plains*, No. 17-CV-6156, 2020 WL 1497054, at *20 (S.D.N.Y. Mar. 25, 2020) (alterations adopted) (quotation marks omitted) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006), *abrogated on other grounds as recognized by Kravitz v. Purcell*, 87 F.4th 111, 119, 122 (2d Cir. 2023), then *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)). "There is no static test to determine whether a deprivation is sufficiently serious; instead, the conditions themselves must be evaluated in light of contemporary standards of decency." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (citation and quotation marks omitted). However, the situation usually must be "a 'condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Grimmett v. Corizon Med. Assocs. of N.Y.*, No. 15-CV-7351, 2017 WL 2274485, at *3 (S.D.N.Y. May 24, 2017) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

The second element asks, objectively, whether the defendant officer "acted intentionally to impose the alleged condition" or "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or

should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35 (explaining that, "[i]n other words, the 'subjective prong' (or 'mens rea prong') of a[n Eighth Amendment] deliberate indifference claim is defined objectively" (italics omitted)); *see also Howard v. Brown*, No. 15-CV-9930, 2018 WL 3611986, at *4 (S.D.N.Y. July 26, 2018) (noting this element is applied "differently to claims under the Eighth Amendment and the Fourteenth Amendment"). "[A]ny [Section] 1983 claim for a violation of due process[, however,] requires proof of a mens rea greater than mere negligence." *Smith*, 2017 WL 4417699, at *3 (quoting *Darnell*, 849 F.3d at 36) (italics omitted); *see also Dumel v. Westchester Cnty.*, 656 F. Supp. 3d 454, 465 (S.D.N.Y. 2023) (same). Courts routinely have held, relying on Eighth Amendment caselaw, that "[t]he same standards apply to a claim of deliberate indifference to serious medical needs on the part of nonmedical prison personnel" as apply to medical personnel. *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *13 (S.D.N.Y. Mar. 30, 2017) (quoting *Hodge v. Coughlin*, No. 92-CV-622, 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994), *aff'd*, 52 F.3d 310 (2d Cir. 1995)).

### b. Application

Plaintiff has plausibly alleged deliberate indifference because Plaintiff has alleged sufficient facts to plausibly establish that the Medical Defendants knew of a specific risk that Plaintiff contracted cancer yet chose to ignore it.

With respect to Defendants' knowledge, Plaintiff alleges that Mr. Freudenberg repeatedly raised alleged cancer symptoms with Khouri and Zaccagnino. Specifically, from 2019 through May 2020, Mr. Freudenberg lodged numerous complaints regarding lumps on his body and conditions ranging from "severe pain in [his] bones" to spitting up blood; and he made at least five requests to be "checked for cancer." (SAC ¶¶ 118–20.) In that time, he also received several blood tests revealing an elevated sedimentation rate—yet another condition Plaintiff

10

contends was indicative of cancer. (*Id*. ¶¶ 127–28.) Defendants counter that these allegations only establish that they only (and reasonably) "misdiagnosed" Plaintiff with hypothyroidism in response to these complaints, rendering them unaware of any cancer risk.[9] (Defs' Mem. 7–8.) And if that were all, they may have a point. But Mr. Freudenberg's subsequent visit to an outside specialist puts any question about awareness aside. The specialist made "specific" findings that Mr. Freudenberg's symptoms "may be the result of cancer," (*id*. ¶ 135), and recommended to OCCF staff, including "Khouri [and] Zaccagnino" that they schedule a biopsy, (*id*. ¶ 5). The recommendation, combined with Mr. Freudenberg's worsening symptoms, are arguably enough for subjective knowledge. At the very least, Defendants should have known that the failure to even assess Mr. Freudenberg for cancer and commence necessary treatment would pose a substantial risk to his health. (*Id*. ¶¶ 86, 130, 133.)

With respect to indifference, Plaintiff alleges that, despite Mr. Freudenberg's worsening symptoms and dozens of requests for attention, Defendants did nothing to address any cancer risk until it was too late. (*Id*. ¶¶ 141–45.) Defendants allegedly failed to schedule a biopsy for over 10 months. (*Id*. ¶ 136.) Nor are they alleged to have taken any steps "to investigate—let alone verify—whether it would be medically appropriate" to ignore the specialist's recommendation. *See Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005). To be sure, Plaintiff admits that Defendants nominally diagnosed Mr. Freudenberg and administered "treatment" in the form of pain medication and antidepressants. (SAC ¶¶ 130–31.) But Plaintiff correctly points out that the provision of *some* treatment is not dispositive where, as here, the treatment appears "so woefully inadequate" compared to the inmate's condition that it "amount[s] to no

---

[9] Missing from Defendants' argument is any explanation of why a hypothyroidism diagnosis is dispositive of cancer or why the diagnosis meant that a biopsy was unnecessary.

treatment at all." *See Gay v. Terrell*, No. 12-CV-2925, 2013 WL 5437045, at *19 (E.D.N.Y.

Sept. 27, 2013) (quotation marks omitted) (quoting *Johnson v. Wright*, 234 F. Supp. 2d 352, 360

(S.D.N.Y. 2002) ("Although federal courts are reluctant to second guess medical judgments . . .

deliberate indifference will be found where the medical attention rendered was so woefully

inadequate as to amount to no treatment at all." (alterations adopted) (quotation marks

omitted))).[10]   Regardless, the Second Circuit has repeatedly held that this exact sort of

allegation—"deliberately ignor[ing] the medical recommendations of a[n inmate's] treating

physicians"—gives rise to deliberate indifference.  *Rodriguez v. Burnett*, No. 22-CV-2198, 2023

WL 3902705, at *12 (S.D.N.Y. June 7, 2023) (quoting *Johnson*, 412 F.3d at 404); *Gill v.

Mooney*, 824 F.2d 192, 196 (2d Cir.1987) ("Prison officials are more than merely negligent if

they deliberately defy the express instructions of a prisoner's doctors."); *see also Rodriguez v.

Manenti*, 606 F. App'x 25, 27 (2d Cir. 2015) (summary order) (affirming holding that jury could

find deliberate indifference where "[the p]laintiff presented evidence that [the d]efendant

knowingly acted contrary to the recommendation of the orthopedic surgeon to whom the Bureau

of Prisons had referred [the p]laintiff").  Plaintiff, then, has satisfied her burden under the

subjective prong of the Fourteenth Amendment test.

   In response, Defendants seize on the SAC's two references to "misdiagnose[s]," arguing

that this is a case of poor medical judgment as opposed to indifference.  (*See* Defs' Mem. 8–9;

*see also* SAC ¶¶ 130–32 (referencing "repeated[] misdiagnose[s]" of Mr. Freudenberg).)  They

---

[10] Plaintiff also alleges that this course of treatment was just a pretext to keep
Mr. Freudenberg's in a "stupor" where he could not raise further concern.  (SAC¶¶ 120, 122.)
The Court need not address that additional theory, as Plaintiff's other allegations are sufficient to
plead "deliberate indifference" as opposed to mere "reasonable but mistaken judgment[]."  *See
Case v. Anderson*, No. 16-CV-983, 2017 WL 3701863, at *18 (S.D.N.Y. Aug. 25, 2017).

also cite cases holding that failure to schedule a biopsy, without more, generally amounts to mere negligence.  *See Grubbs v. Ngbodi*, No. 21-CV-02906, 2022 WL 4072926, at *8 (S.D.N.Y. Sept. 2, 2022).  But there are multiple problems with this theory.  First, in alleging that Defendants "misdiagnosed" Mr. Freudenberg, Plaintiff is not conceding that Defendants were merely negligent.  Instead, she uses "misdiagnosed" in the sense that Defendants "brush[ed] off" Mr. Freudenberg's complaints rather than taking him seriously, which is in no way akin to an exercise of reasoned medical judgment.  (*See* SAC ¶ 132.)  Second, the relevant biopsy caselaw is distinguishable in key respects.  *Grubbs*, for instance, held that failure to order a biopsy "did not evince deliberate indifference" because the complaint lacked allegations that the defendants "knew or inferred that [the p]laintiff was at a serious risk of prostate cancer."  2022 WL 4072926, at *9.  *Salahudidn v. Goord* similarly held that postponing a biopsy did not constitute "willful blindness" absent someone "arous[ing] [the defendant's] suspicion that postponing the biopsy . . . would be seriously harmful.  467 F.3d at 282, *abrogated on other grounds by Kravitz v. Purcell*, 87 F.4th 111, 119, 122 (2d Cir. 2023).  What was missing in those two cases is present in the SAC:  allegations that someone—an outside specialist—put Defendants on notice that Mr. Freudenberg may have cancer.  The choice not to act on that risk raises a plausible inference of indifference, beyond mere negligence.

Defendants also contend that the SAC lacks allegations that they "even knew about the endocrinologist's purported recommendation."  (Defs' Mem. 9.)  The SAC, however, clearly alleges that the endocrinologist made the biopsy recommendation "*to the staff at [OCCF]* including but not limited to" Khouri and Zaccagnino.  (SAC ¶ 5 (emphasis added).)  Defendants pivot in reply, arguing "including, but not limited to" is too vague to establish "that the recommendation was specifically directed" to Khouri and Zaccagnino.  (Defs' Reply 2.)  But

nothing about "including" renders Plaintiff's specific reference to those Defendants unclear.  It simply introduces a nonexhaustive list of staff who received the recommendation.  *See Fernandez v. Zoni Language Ctrs., Inc*., 858 F.3d 45, 50 (2d Cir. 2017) (citing Black's Law Dictionary 831 (9th ed. 2009) (explaining that the "participle *including* typically indicates a partial list" (emphasis in original))).  Even if Khouri and Zaccagnino were not directly notified, however, Plaintiff's claim could still proceed on a constructive notice theory.  Indeed, it is entirely plausible that two doctors responsible for Mr. Freudenberg's care, (*see* SAC ¶¶ 79–80, 86–87), whom he saw frequently, (*see id*. ¶¶ 130–31), and who had access to his records, (*see id.*), "should have known" that an outside specialist sent a biopsy recommendation to the facility, *see Darnell*, 849 F.3d at 35.

There is also some dispute about whether Defendants are to blame for a failure to *schedule* a biopsy even if they were aware of the endocrinologist's recommendation.  (Defs' Mem. 9–10.)  For support, Defendants cite two cases holding that a "fail[ure] to follow up with those responsible for scheduling [outside medical] appointments" constitutes "mere negligence" where the inmate never "informed [defendants] that [any scheduling] delay was causing him [harm]."  *See Raynor v. Feder*, No. 20-CV-1343, 2023 WL 6295647, at *7 (D. Conn. Sept. 27, 2023); *see also Singletary v. Russo*, 377 F. Supp. 3d 175, 193 (E.D.N.Y. 2019) (granting summary judgment where there was "no indication in the record that [the defendant] was aware that the appointment . . . had not been scheduled promptly").  Yet harm from delay is almost a given on the facts of case.  Defendants allegedly knew Mr. Freudenberg may have cancer; any delay, not to mention a delay of 10 months, risked harm from the cancer going undiagnosed and untreated.  Moreover, both *Raynor* and *Singletary* recognize that if an inmate "lodged repeated complaints about his doctor's failure to schedule a prescribed [] exam," those complaints would

suffice to put defendants "on actual or constructive notice" of the inmate's medical needs.  *See Singletary*, 377 F. Supp. 3d at 193 (citation omitted); *Raynor*, 2023 WL 6295647, at *7 (contrasting that case's facts with a situation "where [a] plaintiff repeatedly complains to a medical defendant who had referred him to the specialist").  And Plaintiff claims Mr. Freudenberg did exactly that by making dozens of "follow up requests that the biopsy be scheduled."  (SAC ¶ 136.)  These cases are further distinguishable because they both considered record evidence establishing that defendants "were not involved in or responsible for scheduling."  *See Raynor*, 2023 WL 6295647, at *7; *see also Singletary*, 377 F. Supp. 3d at 193 (same).  Defendants point to no such fine-grained distinctions in the SAC and the Court must accept as true that Khouri and Zaccagnino had overall responsibility for Mr. Freudenberg's care.  (*See, e.g.*, SAC ¶ 80.)  Drawing all inferences in Plaintiff's favor, it is plausible that Khouri and Zaccagnino, with knowledge of Plaintiff's symptoms and cancer risk, would have been responsible for ordering *and* following up on a biopsy request.  "A reasonable jury could [therefore] infer deliberate indifference from the failure of [Defendants] to take further steps to see that [Mr. Freudenberg was given a[ biopsy]."  *See Lloyd v. Lee*, 570 F. Supp. 2d 556, 569 (S.D.N.Y. 2008) (finding inmate plausibly alleged deliberate indifference where defendants failed to follow up on MRI request for nine months).

With plausible allegations of indifference on the table, any remaining questions about whether Defendants *in fact* exercised their medical judgment, or failed to schedule a biopsy for some other reason, (*see* Defs' Mem. 10), must be resolved at summary judgment or trial.  *See Kucharczyk v. Westchester Cnty.*, 95 F. Supp. 3d 529, 542 (S.D.N.Y. 2015) (quotation marks omitted) (denying motion to dismiss where allegations "support[ed] [a] claim . . . [of] deliberate indifference"); *Adams v. Beaudouin*, No. 09-CV-2136, 2011 WL 240714, at *7 (E.D.N.Y. Jan.

24, 2011) (finding that "[w]hether the[] actions by [the] [d]efendants constituted adequate

medical treatment or an unconstitutional delay . . . [could not] be determined without discovery

on what, in fact, constituted adequate medical treatment").

### 2.  ADA Discrimination

Defendants also move to dismiss Plaintiff's ADA and Rehabilitation Act claims.  They

argue (1) that Defendants are not "public entities" as defined by those statutes and that (2) in any

event, Plaintiff has not pled an inference of discrimination.  (Defs' Mem. 18–20.)

Title II of the ADA provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity."  42 U.S.C. § 12132; *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998)

("[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates.").  To

establish a Title II claim, a plaintiff must allege "(1) that she is a qualified individual with a

disability; (2) that she was excluded from participation in a public entity's services, programs or

activities or was otherwise discriminated against by a public entity; and (3) that such exclusion

or discrimination was due to her disability."  *Tardif v. City of New York*, 991 F.3d 394, 404 (2d

Cir. 2021) (quoting *Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016)); *Monroe v. New York State

Dep't of Corr. & Cmty. Supervision*, No. 16-CV-2818, 2019 WL 4688665, at *9 (S.D.N.Y. Sept.

25, 2019) (same); *Elbert v. N. Y. State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 594–95

(S.D.N.Y. 2010) (same).  Section 504 of the Rehabilitation Act imposes nearly identical

requirements, and courts may conduct the analysis under that statute congruently.  *See Henrietta

D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003); *Meekins v. City of New York*, 524 F. Supp.

2d 402, 406 (S.D.N.Y. 2007).  "A plaintiff may base a Title II claim 'on any of three theories of

liability:  disparate treatment (intentional discrimination), disparate impact, or failure to make a

reasonable accommodation.'" *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 91 (2d Cir. 2021)

(quoting *Tardif*, 991 F.3d at 404).

Because Title II targets discrimination "by reason of" disability, courts routinely dismiss

inmate ADA claims of inadequate medical treatment lacking allegations that the inmate "was

treated differently because of his or her disability." *See Elbert*, 751 F. Supp. 2d at 595

(collecting cases); *see also Fate v. Petranker*, No. 19-CV-05519, 2020 WL 3640007, at *9

(S.D.N.Y. July 6, 2020) (same); *Jones v. Ng*, No. 14-CV-1350, 2015 WL 998467, at *9

(S.D.N.Y. Mar. 5, 2015) (same).  Instead, there must be some allegation that the covered public

entity "denied services provided to the able-bodied on the basis of their disabilities."  *See Davis*,

821 F.3d at 260.

Assuming, without deciding, that Wellpath constitutes a "public entity," the SAC is

simply devoid of non-conclusory allegations of discrimination.  By and large, Plaintiff relies on

allegations of inadequate treatment to support both her deliberate indifference and ADA/RA

claims.  (*See* Pl's Mem. 19–20 (citing SAC ¶¶ 115–24, 138).)  The SAC, however, has little to

add in terms of discrimination.  After stripping out the allegations that merely recite elements of

an ADA claim, (SAC ¶¶ 184–86), all that is left is an allegation that "Defendants . . . ignored

[Mr. Freudenberg's] pleas for medical attention, [] thinking that he did not know what was going

on with his body because of his disability."  (*Id*. ¶ 187.)  This allegation, though, just "speculates

that these incidents are attributable to discriminatory animus."  *See DeLeon v. Teamsters Loc.

802, LLC*, No. 20-CV-24, 2021 WL 1193191, at *12 (E.D.N.Y. Mar. 29, 2021).  When it comes

to supporting that assertion, Plaintiff relies on the same underlying allegations of inadequate

care.  She does not point to discriminatory interactions, disparate treatment, or any other typical

indicia of discrimination.  And, as noted above, claims of inadequate medical treatment, "even

when made by a person with a serious disability, does not state a claim under the ADA." *See, e.g.*, *Elbert*, 751 F. Supp. 2d at 596; *Atkins v. Cnty. of Orange*, 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003) (dismissing mentally-disabled inmates' ADA claim, which alleged that they were placed in isolation, because they did not "allege that violent and self-destructive inmates who are disabled due to mental illness are treated any differently than violent, self-destructive inmates who are not disabled due to mental illness"); *cf. Jones*, 2015 WL 998467, at *9 (granting judgment to defendants where no fact supported ADA claim "beyond those alleged in support of [the plaintiff's] deliberate indifference claim").[11]

Plaintiff attempts repackage those allegations as a failure to accommodate theory. (*See* Pl's Mem. 21–22.) But this alternative tact fails for the same reason her disparate treatment claim does. In assessing failure to accommodate claims, courts consider "as a practical matter" whether an inmate was denied "'meaningful access' to services, programs or activities"— medical services, in this case—which they could access with a reasonable accommodation. *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (quoting *Henrietta D.*, 331 F.3d at 273). Here, too, though, Plaintiff must allege that "[a disability] *caused* [the] deprivation of medical services" in the first instance; otherwise, she cannot "transform her allegations regarding [] inadequate medical treatment into a 'failure to accommodate' claim." *See Tardif*, 991 F.3d at 405 (emphasis added) (explaining that, "[t]o hold otherwise would allow inmates to litigate in federal court virtually every medical malpractice claim arising in a custodial setting under the auspices of the ADA"). And, as explained above, the SAC simply lacks that connective tissue. Instead, Plaintiff's claims all revolve around the provision of inadequate care

---

[11] As the Court hopes is clear, nothing about this holding sanctions the inadequate medical treatment of disabled inmates. It only means that Plaintiff must seek redress not under the ADA, but rather under Section 1983, as she has sufficiently done here.

because of Defendants' indifference.  Without more, those allegations—no matter how they are

packaged—go to the "the substance of the services provided" rather than "illegal discrimination"

under the ADA.  *See Doe v. Pfrommer*, 148 F.3d 73, 84 (2d Cir. 1998); *see also Greene v. City*

*of New York*, --- F. Supp. 3d ---, 2024 WL 1308434, at *15 (S.D.N.Y. Mar. 26, 2024) (dismissing

ADA failure to accommodate claim that "relate[d] solely to whether [p]laintiffs received

adequate medical treatment in police custody for their disability" (quotation marks omitted)

(alteration adopted)); *Maccharulo v. New York State Dep't of Corr. Servs.*, No. 08-CV-301, 2010

WL 2899751, at *4 (S.D.N.Y. July 21, 2010) ("A challenge to the adequacy of services

provided, as opposed to a challenge alleging denial of services provided to non-disabled persons,

is not a valid claim under the ADA or the Rehabilitation Act.").

### 3.  *Monell* Liability

Defendants further argue that the County and its agents should not be held liable for any

violations of Mr. Freudenberg's rights.  (Defs' Mem. 12–16.)

"Congress did not intend municipalities to be held liable [under Section 1983] unless

action pursuant to official municipal policy of some nature caused a constitutional tort."

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Thus, "to prevail on a claim against a

municipality under [S]ection 1983 based on acts of a public official, a plaintiff is required to

prove:  (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right;

(3) causation; (4) damages; and (5) that an official policy of the municipality caused the

constitutional injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *see also*

*Williams v. Lohard*, No. 20-CV-10571, 2022 WL 269164, at *3 (S.D.N.Y. Jan. 28, 2022) ("[The]

[p]laintiff's claim against the [c]ity fails for lack of facts supporting the existence of a municipal

policy or practice." (citing cases)); *Palmer v. City of New York*, 564 F. Supp. 3d 221, 240

(E.D.N.Y. 2021) (dismissing claim against city where the plaintiffs failed to "sufficiently allege

[] that they suffered constitutional violations as a result of an official policy or custom" (quotation marks omitted)); *Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011).

This multi-factor test, and particularly the fifth element, reflects the notion that "a municipality may not be held liable under [Section] 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under [Section] 1983 "by application of the doctrine of respondeat superior." (italics omitted)); *Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong"); *Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee

20

of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Oklahoma City v. Tuttle*,

471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional

activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes

proof that it was caused by an existing, unconstitutional municipal policy, which policy can be

attributed to a municipal policymaker."); *Bird v. Cnty. of Westchester*, No. 20-CV-10076, 2022

WL 2263794, at *12 (S.D.N.Y. June 23, 2022) ("[The] [p]laintiff fails to allege the existence of

any other similar incident, which dooms [the p]laintiff's claim because a custom or policy cannot

be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the

municipality." (quotation marks omitted)); *Santana v. City of New York*, No. 15-CV-6715, 2018

WL 1633563, at *10 (S.D.N.Y. Mar. 29, 2018) ("[A] 'single incident alleged in a complaint,

especially if it involved only actors below the policy-making level, does not suffice to show a

municipal policy.'") (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)); *Brogdon v. City*

*of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is

generally insufficient to establish the affirmative link between the municipal policy or custom

and the alleged unconstitutional violation.").

    A plaintiff may satisfy the "policy or custom" requirement by alleging one of the
following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by
> government officials responsible for establishing the municipal policies that caused
> the particular deprivation in question; (3) a practice so consistent and widespread
> that, although not expressly authorized, constitutes a custom or usage of which a
> supervising policy-maker must have been aware; or (4) a failure by policymakers
> to provide adequate training or supervision to subordinates to such an extent that it
> amounts to deliberate indifference to the rights of those who come into contact with
> the municipal employees.

*Atadzhanov v. City of New York*, No. 21-CV-5098, 2022 WL 4331304, at *11 (S.D.N.Y. Sept.

19, 2022) (citations omitted); *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226–27 (2d

Cir. 2004) (describing methods of establishing *Monell* liability).  Moreover, as noted, a plaintiff

must also establish a causal link between the municipality's policy, custom, or practice and the

alleged constitutional injury.  *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy'

might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the

particular policy be the 'moving force' behind a constitutional violation.  There must at least be

an affirmative link between[, for example,] the training inadequacies alleged, and the particular

constitutional violation at issue." (emphasis omitted)); *Batista v. Rodriguez*, 702 F.2d 393, 397

(2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the

plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Hincapie v. City of*

*New York*, 434 F. Supp. 3d 61, 77 (S.D.N.Y. 2020) (holding that the plaintiff failed to state a

*Monell* claim because the plaintiff "has not pled facts demonstrating a direct link between his

injuries and the alleged municipal policy"); *Johnson v. City of New York*, No. 06-CV-9426, 2011

WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a

municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative

link—between the policy and the deprivation of his constitutional rights" (quotation marks

omitted)).

Plaintiff's claim is that the County "has a practice" of "constitutionally inadequate

medical care and services as a cost-savings measure."  (Pl's Mem. 12–16.)  Although Plaintiff

occasionally uses "practice," "policy," and "custom" interchangeably, her claim clearly belongs

in the widespread practice bucket.  The SAC contains no allegations regarding a "policy

officially promulgated by [the County] or a specific act taken by a final policymaker."  *See Lara-*

*Grimaldi v. Cnty. of Putnam*, No. 17-CV-622, 2018 WL 1626348, at *20 (S.D.N.Y. Mar. 29,

2018).  And she does not allege or argue any facts about a failure to train or supervise relevant prison medical staff.  *See Atadzhanov*, 2022 WL 4331304, at *11.

To demonstrate a de facto policy or custom through a widespread practice, a plaintiff must "show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions."  *Buari v. City of New York*, 530 F. Supp. 3d 356, 398 (S.D.N.Y. 2021) (quoting *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)).  A practice can constitute a custom under *Monell* when the practice is "persistent and widespread," or "permanent and well settled as to constitute a 'custom or usage' with the force of law" and to "imply the constructive knowledge of policymaking officials."  *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 400 (S.D.N.Y. 2021) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992)); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (noting that to demonstrate a practice is sufficiently widespread and crystalized to constitute a custom under *Monell*, "a plaintiff must prove that the custom at issue is permanent and well-settled" (citing *Praprotnik*, 485 U.S. at 127)).

In support of the alleged widespread practice of denying adequate care for profit, Plaintiff provides two types of allegations, both of which the Court finds insufficient.

First, Plaintiff incorporates a selection of documents from outside organizations detailing complaints and investigations into Wellpath and its predecessor CCS.  Specifically, she references a report claiming Wellpath has been sued over 1,000 times in federal court, (SAC ¶ 104), a CNN report detailing Wellpath's substandard services due to cost containment, (*id*. ¶¶ 106–09), and a complaint letter by Catholic Charities and Community Service detailing similar deprivations (*id.* ¶¶ 110–11)—including one similar action that Plaintiff states settled (*id*.

¶ 112; Pl's Mem. 12–14.)  These documents are categorically insufficient for purposes of *Monell*.

With respect to complaints in other proceedings, courts in this district have widely held that "citations to lawsuits, even if they did involve comparable conduct, do not alone establish a custom or practice that is widespread and persistent, particularly if the lawsuits did not result in an adjudication of liability." *Taranto v. Putnam Cnty.*, No. 21-CV-2455, 2023 WL 6318280, at *18 (S.D.N.Y. Sept. 28, 2023) (quoting *Bethune v. Westchester Cnty.*, No. 18-CV-3500, 2020 WL 1032508, at *5 (S.D.N.Y. Mar. 2, 2020)); *Barnett v. Westchester Cnty.*, No. 18-CV-2483, 2020 WL 1032445, at *5 (S.D.N.Y. Feb. 28, 2020) (same); *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (concluding that "lawsuits cited by [the] [p]laintiff in the [proposed amended complaint], even when combined with [other] allegations . . . are insufficient to plausibly support an inference of a widespread custom" to establish *Monell* municipal liability).  Indeed, the mere filing of a case or later settlement is not probative of whether "the policies [P]laintiff alleges exist do in fact exist." *Kucharczyk*, 95 F. Supp. 3d at 543 (quotation marks and citation omitted).  And the sheer "number of complaints filed [against a defendant], without more, indicates nothing," as "people may file a complaint for many reasons, or for no reason at all." *Id.* (alteration adopted).[12]  Plaintiff acknowledges that the one similar case cited in the SAC settled, (*see* SAC ¶ 112), and provides no information about what any of the other suits against Wellpath involved or their disposition.  The same rationale

---

[12] To be sure, "[a] litany of prior lawsuits may suffice to put the [County] on notice that greater training, supervision, or officer discipline was needed." *Falls v. Campbell*, No. 17-CV-35, 2019 WL 1255768, at *7 (S.D.N.Y. Mar. 19, 2019).  But Plaintiff does not allege a claim on that basis, nor does she provide even "conclusory allegations regarding the County's response to the lawsuits." *See id.* (alteration adopted).

also applies to the CCCS complaint letter, which is based largely on the anonymous declarations of several OCCF inmates as opposed to findings of liability.  (*See id.* ¶ 111.)  Accordingly, Plaintiff "cannot allege a widespread practice on the basis of [this information] alone."  *See Taranto*, 2023 WL 6318280, at *18.

Plaintiff's reference to a CNN investigation is likewise insufficient.  The investigation references a large body of information including lawsuits, purported instances of inadequate care at other Wellpath-serviced facilities reviewed by the network, letters from government agencies throughout the country, interviews with former employees, and more.  (*See* SAC ¶¶ 106–09.) And it broadly suggests that Wellpath is more concerned with cost-cutting than it is with care— which is undoubtedly concerning, if not alarming.  But just like "unsupported legal filings," none of this material "*substantiates* wrongdoing of some kind," not to mention wrongdoing *at OCCF* giving rise to similar constitutional violations.  *See Roman v. City of Mount Vernon*, No. 21-CV-2214, 2022 WL 2819459, at *22 (S.D.N.Y. July 19, 2022) (citing *Marom v. City of New York*, No. 15-CV-2017, 2016 WL 916424, at *22 (S.D.N.Y. Mar. 7, 2016) ("Neither a newspaper report nor an academic paper reporting on incidents that ought to be investigated is a showing of anything entitled to a presumption of truth.")).  The one substantiated finding the CNN investigation does cite—a DOJ Civil Rights Of Institutionalized Persons Act ("CRIPA") investigation into a Virginia jail[13]—underscores the deficiencies of Plaintiff's allegations here. Those sorts of investigations, which courts have held to be sufficient for *Monell* purposes, involve specific findings of unconstitutional conduct at the relevant facility.  *See Kucharczyk*, 95 F. Supp. 3d at 544 (referencing a DOJ investigation into the Westchester County Jail);

_____

[13] The relevant letter may be accessed at:  https://www.justice.gov/opa/pr/justice-department-alleges-conditions-hampton-roads-regional-jail-violate-constitution-and [perma.cc/CZ34-NE4Y].

*Santiago v. Westchester Cnty.*, No. 13-CV-1886, 2014 WL 2048201, at \*6 (S.D.N.Y. May 19, 2014) (same). And here, Plaintiff does not provide allegations that "[Orange] County policymakers were aware of the deficiencies in [OCCF's] provision of medical care," *see Kucharczyk*, 95 F. Supp. 3d at 544, or "of any unconstitutional acts by *their* employees" to which they turned a blind eye, *see Melvin v. Cnty. of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at \*15 (S.D.N.Y. Mar. 29, 2016) (emphasis in original). This information, even considered together, is thus insufficient to give rise to *Monell* liability. *See An v. City of New York*, 230 F. Supp. 3d 224, 229–30 (S.D.N.Y. 2017) (dismissing *Monell* claim based on "cites [to] six lawsuits filed between 2012 and 2016 and one newspaper report" but "fail[ed] to allege that any of the six lawsuits, which were filed over a course of four years, resulted in a finding that the NYPD officers violated the plaintiffs' First Amendment rights"); *see also McDonald v. City of Troy*, 542 F. Supp. 3d 161, 175–76 (N.D.N.Y. 2021) (holding that while "Plaintiffs' eight settled [excessive force] lawsuits over eight years is not the best record for a small city like Troy to sport[,] . . . because plaintiff has not pointed to a single related case that actually resulted in a finding of liability on the City's part, that showing falls woefully short of establishing *Monell* liability").

Second, Plaintiff argues that Mr. Freudenberg's "own individual experience" provides an independent basis for *Monell* liability. (Pl's Mem. 14–15.) Plaintiff recognizes, of course, that she cannot state a widespread practice by alleging a single instance of unconstitutional conduct and "extrapolating to the entire jail population." *Kirton v. Doe*, No. 20-CV-10860, 2023 WL 2586279, at \*9 (S.D.N.Y. Mar. 21, 2023). Instead, she relies on a narrow exception in the single incident caselaw where "proof of the incident *includes* proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."

*See Tuttle*, 471 U.S. at 824 (emphasis added).  For instance, Plaintiff cites one case where a complaint alleged not just one incident, but rather "a series of incidents involving separate actors over a period of at least twelve hours" which "suggest[ed] the existence of a policy" given "the consistency of th[ose] separate actors' conduct."  *Sanchez v. New York Correct Care Sols. Med. Servs., P.C.*, No. 16-CV-6826, 2018 WL 6510759, at *11 (W.D.N.Y. Dec. 11, 2018); *see also Burns v. Rensselaer Cnty.*, No. 19-CV-701, 2021 WL 1091558, at *8–9 (N.D.N.Y. Mar. 22, 2021) (citing *Sanchez*).

But the SAC is not susceptible to the move.  The "incident" giving rise to liability here is Defendants' decision to ignore the endocrinologist's recommendation.  *See* supra Section II.B.1.b.  That single decision does not suddenly turn into many because Plaintiff allegedly made "over one hundred follow-up requests."  (*see* Pl's Mem. 15 (citing SAC ¶¶ 135–38)).  Unlike the *Sanchez* plaintiff, who alleged when and how each individual actor denied his requests for care, *see Sanchez*, 2018 WL 6510759, at *1–3, Plaintiff does not specify who Mr. Freudenberg followed up with (or when).  Absent that type of specificity, the Court cannot transform an act or omission into its own "policy" or "custom" simply because it has lasting consequences.  At bottom, then, Plaintiff's claim turns on a single incident of unconstitutional conduct and is therefore insufficient for purposes of *Monell*.  *Vasquez v. City of New York*, No. 20-CV-4641, 2023 WL 8551715, at *4 (S.D.N.Y. Dec. 11, 2023) ("[C]ourts have dismissed custom or practice *Monell* claims that rely solely on one instance of conduct to prove the existence a persistent and widespread custom."); *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 306 (2d Cir. 2020) ("[A] policy

or custom cannot be inferred from . . . a single incident of illegality." (quoting *Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980))).[14]

### 4.  Wrongful Death

Defendants also seek dismissal of Plaintiff's wrongful death claim for failure to allege the right type of damages.  (Defs' Mem.  21.)

As an initial matter, Plaintiff argues that Defendants either waived this argument, or should be estopped from raising it, by failing to raise it in their pre-motion letter.  (Pl's Mem. 22.)[15]  Although Plaintiff's reading of the letter is correct, her argument about the pre-motion process lacks merit.  "'[A] pre-motion conference letter' does not constitute 'a "motion" under Rule 12 such that a failure to raise a defense in such a letter results in a waiver of that defense.'" *Feldman v. Comp Trading, LLC*, No. 19-CV-4452, 2021 WL 930222, at *3 (E.D.N.Y. Mar. 11, 2021) (quoting *Schweitzer ex rel. Schweitzer v. Crofton*, No. 08-CV-135, 2010 WL 3516161, at *7 (E.D.N.Y. Sept. 1, 2010) (internal quotation marks omitted)).[16]  And Plaintiff makes no argument why considering Defendants' argument—a pure and straightforward legal issue— would prejudice her in any way.  The Court will thus consider Defendants' argument, as it has in other cases where parties failed to comply with the pre-motion process but had adequate

---

[14] The Court finds compelling but need not address Defendants' additional argument that there is no "factual nexus" between the alleged cost-saving policy and the inadequate care rendered to Mr. Freudenberg.  (*See* Defs' Reply 6–7.)

[15] Defendants claim that they did raise their damages argument, but the relevant portion of the pre-motion letter instead asserts that Plaintiff's wrongful death claim is time barred.  (*See* Defs' Pre-Motion Letter at 3 n.4.)

[16] As a technical matter, even if a pre-motion letter did count as a "motion," Defendants would still be allowed to raise their failure-to-state a claim defense in a subsequent motion.  *See* Fed. R. Civ. P. 12(g)(2) (providing that "a party [who] makes a motion under [Rule 12] must not make another [Rule 12] motion . . . raising a defense or objection that was . . . omitted from its earlier motion," "[e]xcept as provided in Rule 12(h)(2)"); 12(h)(2)(B) (noting a failure to state a claim defense may be raised "by a motion under Rule 12(c)").

opportunity to brief the issues presented.  *See Goldrich v. Watkins Wellness*, No. 22-CV-3769, 2024 WL 1194716, at *2 n.2 (S.D.N.Y. Mar. 20, 2024).

As to the merits, the elements of a cause of action for wrongful death under New York law are:

> (1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent.

*Melvin*, 2016 WL 1254394, at *22 (quoting *Quinn v. United States*, 946 F. Supp. 2d 267, 277 (N.D.N.Y. 2013)).  As relevant here, the damages available in wrongful death actions are "fair and just compensation for the pecuniary injuries resulting from the decedent's death *to the persons for whose benefit the action is brought*."  *Rivera v. West*, No. 15-CV-1805, 2015 WL 8481554, at *3 (S.D.N.Y. Nov. 24, 2015) (emphasis added) (quoting N.Y. Est. Powers & Trusts Law § 5-4.3(a)).  In other words, such claims must be dismissed if a plaintiff fails to allege the existence of distributees "who have suffered a pecuniary loss."  *McKenzie v. City of Mount Vernon*, No. 18-CV-603, 2018 WL 6831157, at *8 (S.D.N.Y. Dec. 28, 2018).

Here, even assuming Plaintiff is a distributee, she does not allege her own pecuniary loss. (*See generally* SAC.)  Instead, the only damages allegation in connection with this claim states that "*Mr. Freudenberg* was damaged in an amount which exceeds the [relevant] jurisdictional limitation."  (*See id.* ¶ 199 (emphasis added).)  While the measurement of such losses may be a question of fact, their existence is a "pleading requirement[]" and the failure to satisfy that requirement necessitates "dismissal at the pleading stage."  *See Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 402 (S.D.N.Y. 2020) (emphasis omitted) (dismissing wrongful death claim where plaintiff "fail[ed] to mention the existence of distributees or their pecuniary loss anywhere in the pleadings"); *McKenzie*, 2018 WL 6831157, at *8 (holding

29

"plaintiff's wrongful death claims fail because plaintiff fails to allege distributees who have suffered a pecuniary loss"); *see also Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 398–99 (S.D.N.Y. 2013) (explaining that merely alleging the existence of a distributee does not sufficiently allege pecuniary loss). Accordingly, Plaintiff's wrongful death claim is dismissed.

### III.  Conclusion

For the foregoing reasons, Defendants' Motion is granted in part and denied in part. Specifically, Plaintiff's deliberate indifference claim survives and her ADA, *Monell*, and wrongful death claims are dismissed.

Because this is the first adjudication of Plaintiff's claims on the merits, dismissal of Plaintiff's claims is without prejudice. To the extent Plaintiff has a good faith basis for filing an amended complaint, she must do so within 30 days of the date of this Opinion & Order. Failure to properly and timely amend will result in dismissal of her non-surviving claims with prejudice. The Clerk of the Court is respectfully directed to terminate the pending Motion to Dismiss (Dkt. No. 59).

SO ORDERED.

Dated:    September 25, 2024
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge

30